PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 12-1288
No. 12-1418

_____

LITGO NEW JERSEY INC; SHELDON GOLDSTEIN,

Appellants

v.

COMMISSIONER NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION; UNITED STATES
OF AMERICA; UNITED STATES DEPARTMENT OF
ARMY; UNITED STATES DEPARTMENT OF THE AIR
FORCE; UNITED STATES DEPARTMENT OF NAVY;
ALFRED SANZARI ENTERPRISES INC; MARY
SANZARI; DAVID SANZARI, as Executor of the Estate of
Alfred Sanzari; FRANK HUTTLE, as Executor of the Estate
of Alfred Sanzari; MIAN REALTY; KIRBY AVENUE
REALTY HOLDINGS

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-06-cv-02891)
District Judge:  Honorable Anne E. Thompson

_____

Argued February 14, 2013

Before: HARDIMAN, and GARTH, *Circuit Judges*
and STARK[*] *District Judge*.

(Filed: August 6, 2013)

John McGahren [ARGUED]
Andrew McNally
Daniel F. Mulvihill, IV
Patton Boggs
One Riverfront Plaza
6th Floor
Newark, NJ 07102-0000

Brendan M. Walsh
Pashman Stein
21 Main Street
Court Plaza South, Suite 100
Hackensack, NJ 07601-0000
        *Attorneys for Appellants/Cross-Appellees Sheldon
        Goldstein*

Edward Devine
Rachel J. Lehr
A. Paul Stofa

---

[*] Honorable Leonard P. Stark, Judge of the United States District Court for the District of Delaware, sitting by designation.

Office of Attorney General of New Jersey
Division of Law
P.O. Box 097
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ 08625-0000
    *Attorneys for Defendant Commissioner of the New
    Jersey Department of Environmental Protection*

Brian C. Toth [ARGUED]
Aaron P. Avila
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7415
Washington, DC 20044

Jessica O'Donnell
Christina L. Richmond
United States Department of Justice
Environmental Defense Section
Land and Natural Resources Division
P.O. Box 23986
Washington, DC 20026-3986

T. Monique Peoples
United States Department of Justice
Environmental Defense Section
Suite 8000
601 D Street, N.W.
Washington, DC 20004-0000
    *Attorneys for Appellees/ Cross-Appellants Department
    of Air Force, United States Department of Navy and
    United States Department of the Army*

Robert A. Bornstein
Berger & Bornstein
237 South Street
P.O. Box 2049
Morristown, NJ 07962

David F. Edelstein
Christopher R. Gibson
Archer & Greiner
One Centennial Square
33 East Euclid Avenue
Haddonfield, NJ 08033-0000
    *Attorneys for Defendants*

Kenneth K. Lehn [ARGUED]
Winne, Banta, Hetherington, Basralian & Kahn
Suite 101
21 Main Street
Suite 101, Court Plaza South, East Wing
Hackensack, NJ 07601
    *Attorneys for Appellees/Cross-Appellants Frank
    Huttle, David Sanzari and Alfred  Sanzari Enterprises
    Inc.*

Craig S. Provorny
Anthony J. Reitano
Herold Law
25 Independence Boulevard
Warren, NJ 07059-0000
    *Attorneys for Defendant-Appellee Mian Realty*

_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

This appeal comes to us following a seventeen-day bench trial that involved several claims arising under federal and state environmental laws. At issue is which parties bear the responsibility for the removal of hazardous substances present in the soil and groundwater at a parcel of land in Somerville, New Jersey (the Litgo Property or Property). Although this issue is complicated by the fact that the Property has been the site of various private and public concerns since 1910, the District Court engaged in a careful examination of the evidence and the arguments of the parties, and we essentially agree with its adjudication of the case. We disagree with the District Court's determination, however, in two respects, and will reverse in part and remand.

I. Background

A. Contamination of the Litgo Property

The Litgo Property is located at 40 Haynes Street in Somerville, New Jersey. During the past century, title to the Property has passed hands many times, and the site has been put to various uses. Somerville Iron Works, a company that operated a sanitary landfill on adjacent tracts of land, owned the Property in the early 1900s and used it to manufacture pipes and fittings. In 1941, the Property was leased to Columbia Aircraft, a manufacturer that machined precision parts for the United States military effort during World War II. Decades later, in 1976, the Property was purchased by

5

Alfred Sanzari, who converted the buildings thereon into warehouses. Those warehouses were then leased to a number of commercial and industrial tenants, including a company known as JANR Transport, Inc.

Both the soil and the groundwater on the Litgo Property became contaminated as a result of the commercial activity that occurred there over the years. The soil contained high levels of metals and petroleum hydrocarbons, and the groundwater currently contains a high level of volatile organic compounds (VOCs), including trichloroethylene (TCE) and tetrachloroethylene (PCE). The District Court provided a thorough account of the history of this contamination in its opinion, *see Litgo N.J., Inc. v. Martin* (*Litgo I*), 2010 WL 2400388, at *2–19 (D.N.J. June 10, 2010), *on reconsideration in part*, 2011 WL 65933 (D.N.J. Jan. 7, 2011) (*Litgo II*), and so we will recount it only briefly here.

The contamination most likely began in the 1940s, when Columbia Aircraft leased the Property. Columbia Aircraft machined precision parts on-site for military equipment using some equipment owned by the United States government, including boring mills, grinding machines, lathers, milling machines, and a shaper. After the precision parts were machined, they were cleaned of excess grease as part of the "finishing" process. Columbia Aircraft degreased the precision parts in vapor degreaser tanks, using TCE as the degreasing agent. It then disposed of the TCE by dumping it onto the ground and allowing it to evaporate.

The contamination worsened after a series of accidents that occurred between 1983 and 1987. In 1983, a company known as Signo Trading International was storing both

6

hazardous and non-hazardous waste at a location other than the Litgo Property. Some of this waste had been generated by the United States, which had contracted with Resource Technologies Service (RTS), a then-reputable hazardous waste transporter, for its disposal. RTS had arranged to store the waste at Signo's property, but the waste containers were removed under the supervision of the New Jersey Department of Environmental Protection (NJDEP) following a fire in April 1983. Signo was allowed to send non-hazardous substances to a location of its choice, but NJDEP was responsible for ensuring that the hazardous wastes were moved by licensed haulers to licensed facilities. As a result of NJDEP's inadequate supervision, thousands of containers of materials were shipped to the JANR warehouse on the Litgo Property, and some of them contained hazardous waste.

In 1984, the Borough of Somerville became aware that hazardous materials were being stored improperly at the JANR warehouse, and that many of the containers were spilling and leaking. An inspection and inventory of the materials at the warehouse revealed that it contained 106 gallons of TCE. NJDEP hired an inexperienced contractor to remediate the site, resulting in significant problems, including spills and leaks. Both TCE and PCE were likely released into the soil and the groundwater during the warehouse cleanup, contributing to the contamination.

Some of the remedial actions that have since taken place at the Litgo Property may have contributed further to the contamination. Sanzari—the owner of the Litgo Property between 1976 and 1990—hired environmental consultants to investigate the extent of the contamination and conduct remedial activities, such as soil excavations. One of the monitoring wells installed on the Property, however, had a

faulty seal, a defect that likely increased the zone of contamination on the Property.

Although significant action has since been taken to remediate the soil contamination, groundwater contamination remains a significant problem on the Litgo Property. In this case, the central issue is who should be held responsible for past and future remediation.

B. The Litgo Appellants' Involvement at the Litgo Property

The Litgo Property is currently owned by Appellant Litgo New Jersey, Inc., a single purpose entity. Its sole shareholder, Appellant Sheldon Goldstein, first learned about the Property in the 1980s from an acquaintance, Lawrence Seidman, who suggested forming a partnership to develop it. Goldstein, who had previous experience in real estate, intended to have the Property rezoned for residential use, get approvals to build townhouses, and then sell the Property. He entered into an agreement of sale (Sales Agreement) with Sanzari to acquire the Property in August 1985.

Goldstein knew at the time that he entered into the Sales Agreement with Sanzari that there were problems with the site. Sanzari had informed him that there was some soil contamination, and a letter from NJDEP, incorporated by reference into the Sales Agreement, stated that hazardous wastes were being improperly stored at the JANR warehouse and that Sanzari had been ordered to take remedial steps. Goldstein was not, however, aware that TCE was present in the groundwater. Before entering the sale, he neither visited the Property nor further investigated the environmental issues.

The Sales Agreement stated that Sanzari would comply with all of the provisions of the New Jersey Environmental Cleanup Responsibility Act (ECRA), as well as obtain a cleanup plan from NJDEP. It also provided, however, that if the costs of obtaining and processing a cleanup plan were to exceed $100,000, Sanzari would have the option of terminating the Sales Agreement, unless Goldstein agreed to pay all costs in excess of $100,000.

NJDEP rejected Sanzari's proposed cleanup plan, and Sanzari—concerned about the potential cleanup costs—attempted to exercise his right to cancel the contract. Goldstein sought specific performance of the Sales Agreement in the Superior Court of New Jersey. During the suit, Goldstein hired an environmental consulting firm, EWMA, to review the compliance documents and cost estimates created by Sanzari's environmental consultants. EWMA criticized the reports for not fully disclosing the soil contamination and for failing to address potential groundwater issues. It found that the actual costs of a cleanup could not be accurately estimated based on the present information, and concluded that the actual costs could be far greater than the existing estimate.

Nevertheless, Sanzari and Goldstein reached an agreement regarding the Litgo Property, pursuant to which samples taken from monitoring wells on the Property would be tested for various substances. Goldstein could elect to move forward with the transaction within ten days of receiving the results, and, if he did so, he would assume all ECRA compliance costs in excess of $100,000.

The wells were tested for VOCs, including TCE, as well as metals, PCBs, pesticides, and cyanide. Sanzari

9

received the preliminary results for all of the substances, but sent only the preliminary results for metals, PCBs, pesticides, and cyanide to Goldstein's counsel. He also failed to disclose that there were concerns about TCE contamination on a farm near the Litgo Property.

Meanwhile, Goldstein's partner, Seidman, decided not to proceed with the sale because of concerns about potential environmental costs. Goldstein nevertheless reelected to proceed with the transaction in June 1989. Thereafter, Goldstein received a report that included the full test results, stating that the TCE levels at the Property exceeded NJDEP guidelines.

When he discovered that he would be responsible for additional groundwater investigation, Goldstein tried to refuse to take title to the Litgo Property, but the New Jersey Superior Court issued an order in December 1989 requiring him to proceed with the transaction. After he assumed ownership of the Property and Sanzari's obligations under the cleanup plan, Goldstein transferred title of the Property to Litgo New Jersey.

Beginning in 1990, Goldstein and Litgo New Jersey (the Litgo Appellants) retained two environmental consultants (first EWMA, and, after a dispute with EWMA, JM Sorge, Inc.) to carry out the cleanup plan. The consultants investigated the soil contamination and conducted remedial activities, including the excavation of contaminated soil. The Litgo Appellants did not, however, conduct comprehensive sampling for VOCs until 1997. Although they have installed multiple wells on or near the Property to determine the extent of the groundwater contamination, they had not, at the time of trial, engaged in any work to remediate that contamination.

### C. Prior Litigation

Before filing the present action, Goldstein had been involved in several other lawsuits regarding the contamination at the Litgo Property. In 1996, he filed a lawsuit in the New Jersey Superior Court against multiple parties, including Sanzari, Sanzari's environmental consultants, and Dande Plastics, a company that conducted machining and manufacturing operations at a building near the Litgo Property. He alleged, among other things, that Sanzari's environmental consultants had failed to properly investigate and remediate the TCE contamination at the Litgo Property. The New Jersey Superior Court granted summary judgment in favor of the consultants. Goldstein also asserted a Spill Act claim against Dande Plastics, asserting that it was a source of contamination at the Property. The District Court granted Dande Plastics' motion to dismiss in part, and Goldstein and Dande Plastics then settled the remainder of the claims for $105,000.

Goldstein was also involved in a lawsuit against his environmental consultant, EWMA. EWMA sued the Litgo Appellants after they failed to pay their bills, and the Litgo Appellants brought a counterclaim, asserting that EWMA had performed negligently and provided substandard services at the Property.

### D. Current Litigation

#### 1. Claims

In June 2006, the Litgo Appellants filed the present action in the United States District Court for the District of New Jersey, which named the Sanzari Appellees and the

11

United States Appellees as defendants.[1]  The claims asserted in the complaint were aimed at shifting responsibility for the remediation onto the defendants.

First, the Litgo Appellants brought claims against the Sanzari Appellees and the United States Appellees under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*[2]  As we shall explain in more detail, CERCLA § 107(a) allows private parties to seek compensation for the costs of remediation from parties that are statutorily responsible for the contamination.  The Litgo Appellants sought additional compensatory relief under the New Jersey Spill Compensation and Control Act (Spill Act), N.J. Stat. Ann. § 58:10-23.11 *et seq.*, a statute that functions much like CERCLA, except that it permits parties to recover costs incurred because of petroleum-related contamination.  *Cf.* 42 U.S.C. § 9601(14) (excluding petroleum from the definition of "hazardous substance").  The Sanzari Appellees and the United States Appellees filed counterclaims against the Litgo

---

[1] The Sanzari Appellees include the executors of Alfred Sanzari's estate and Alfred Sanzari Enterprises.  The United States Appellees include the United States of America, the United States Department of the Army, the United States Department of the Air Force, and the United States Department of the Navy.

[2] The Litgo Appellants also brought CERCLA claims against two other parties, Mian Realty and Kirby Avenue Realty Holdings.  They subsequently entered into a settlement agreement with Mian, and their claims against Kirby were dismissed at the close of trial.

Appellants and cross-claims against each other, seeking contribution for the remediation costs under CERCLA § 113(f) and the Spill Act.

The Litgo Appellants also sought injunctive relief under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972, which permits citizen suits against any person who has contributed or is contributing to the disposal of waste in a way that might present an "imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a).

Finally, the Litgo Appellants sought rescission of the Sales Agreement under the New Jersey Sanitary Landfill Facility Closure Act and Contingency Fund (Closure Act), N.J. Stat. Ann. § 13:1E-100 *et seq*., a statute that requires sellers of land to disclose in the contract of sale whether the property has ever been used as a landfill.

## 2. The District Court's Decisions

The District Court entered summary judgment in favor of the Sanzari Appellees on the Litgo Appellants' RCRA claim. It found that this claim was barred by New Jersey's entire controversy doctrine because it should have been asserted in the 1996 New Jersey Superior Court proceedings. It held a bench trial on the remaining claims, which began on January 19, 2010 and ended on February 12, 2010. For reasons that we shall discuss in more detail, the District Court determined that the Litgo Appellants, the Sanzari Appellees, and the United States Appellees were each liable for the costs of remediation under CERCLA. It then allocated the percentage of costs to be borne by each party, ultimately assigning 70% of the costs to the Litgo Appellants, 27% of

13

the costs to the Sanzari Appellees, and 3% of the costs to the United States Appellees. The District Court also found that the Sanzari Appellees and the Litgo Appellants were liable for the costs of remediation under the Spill Act, and allocated the Spill Act costs based on the same factors that it had considered in allocating the CERCLA costs.

The District Court determined that the United States Appellees were likely liable parties under RCRA, but expressed doubt as to whether injunctive relief would be appropriate. It reserved judgment on that issue until after the damages hearing. Finally, the District Court found that because the Litgo Property had not been used as a landfill, the Litgo Appellants were not entitled to rescission under the Closure Act.

The Litgo Appellants and the United States Appellees entered into a settlement agreement before the damages hearing was held. The Litgo Appellants dismissed their claim for injunctive relief under RCRA, but claimed to have reserved the right to seek litigation costs from the United States Appellees as prevailing parties under RCRA. The parties stipulated that the Litgo Appellants had incurred $1,729,279 in CERCLA response costs, and that the United States Appellees owed $51,878.37 based on their allocation.

Following the damages hearing, the District Court found that the Litgo Appellants had incurred $1,566,236.78 in recoverable costs under CERCLA, and denied the Litgo Appellants' request for prejudgment interest. It also found that the Litgo Appellants had incurred an additional $315,098.30 in recoverable costs under the Spill Act. Finally, it held that the Litgo Appellants were not entitled to litigation

costs under RCRA because no relief had been granted on that claim.

The Litgo Appellants appealed, raising a plethora of challenges to the District Court's liability determinations, its allocation of costs, and the damages award. With respect to the CERCLA claims, they argue that the District Court: (1) erred when it held them liable as "operators"; (2) erred when it held that the United States Appellees were not liable as "owners" based on their involvement at the Columbia Aircraft site; (3) abused its discretion when it allocated CERCLA costs; and (4) erred when it denied their request for prejudgment interest. In addition, the Litgo Appellants claim that the District Court's allocation of costs under the Spill Act was an abuse of discretion. As to their RCRA claims, they argue that the District Court erred in two respects: (1) in granting summary judgment for the Sanzari Appellees based on the entire controversy doctrine; and (2) in denying their request for litigation costs. Finally, they claim that the District Court erred in denying their claim under the Closure Act.

The Sanzari Appellees cross-appealed. Like the Litgo Appellants, they claim that the District Court's allocation of CERCLA and Spill Act costs was an abuse of discretion. They also claim that the District Court erred in refusing to grant them a settlement credit for CERCLA damages.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction over the parties' federal law claims under 42 U.S.C. §§ 6972(a) and 9613(b) and 28 U.S.C. § 1331. It had supplemental jurisdiction over the parties' state law claims under 28 U.S.C. § 1367. We

15

have jurisdiction pursuant to 28 U.S.C. § 1291. We may set aside the District Court's factual findings only if they are clearly erroneous, and we exercise plenary review over the District Court's interpretation of the relevant statutes. *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 216 (3d Cir. 2010). We review the District Court's allocation of costs for abuse of discretion. *Id.* (citing *Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429, 445 n.18 (3d Cir. 2005)).

## III. CERCLA Claims

### A. Overview

Congress enacted CERCLA "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (internal quotation marks omitted); *see also United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 257–58 (3d Cir. 1992). To accomplish this goal, CERCLA § 107(a) gives private parties the right to recover costs incurred in cleaning up a waste site from "potentially responsible parties" (PRPs)—four broad classes of persons who may be held strictly liable for releases of hazardous substances that occur at a facility. *Burlington N.*, 556 U.S. at 608−09 (citing 42 U.S.C. § 9607(a)).

Under CERCLA, PRPs are: (1) current owners and operators of the "facility" at which the contamination occurred; (2) persons who were owners or operators of the facility "at the time of disposal of any hazardous substance"; (3) persons who arranged for the disposal or treatment of the hazardous substance; and (4) persons who transported the hazardous substance. 42 U.S.C. § 9607(a). A party falling

16

into one of these four categories will be liable when there is a "release" or a "threatened release" of a hazardous substance from the facility that generates response costs. *Id.*; *see Burlington N.*, 556 U.S. at 608−09; *N.J. Turnpike Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 103–04 (3d Cir. 1999). Once liability has been determined, the court allocates the remediation costs among the PRPs "using such equitable factors as [it] determines are appropriate." 42 U.S.C. § 9613(f). PRPs may seek contribution from other PRPs—including the party that originally brought the § 107(a) action—under CERCLA § 113(f). *Id.*; *United States v. Atl. Research Corp.*, 551 U.S. 128, 138–39 (2007).

Here, the District Court determined that the United States Appellees, the Sanzari Appellees, and the Litgo Appellants were each PRPs. The Sanzari Appellees were liable because they had owned and operated the Litgo Property when hazardous waste was disposed at the JANR warehouse. Litgo New Jersey was liable as the current owner of the Property, and both Litgo Appellants were liable as current operators of the Property. The United States Appellees were liable because they arranged for the disposal of some of the hazardous waste that was ultimately stored at the JANR warehouse. The District Court determined, however, that the United States Appellees did not incur PRP liability based on any releases that had occurred at the Columbia Aircraft site because they did not own any of the relevant facilities; they did not manage, direct, or conduct any of the operations at the Columbia Aircraft site; and they did not own or possess any of the VOCs that were disposed of at the Columbia Aircraft site.

The District Court then turned to the allocation of the remediation costs. It determined that the Sanzari Appellees

17

were responsible for 21% of the costs.[3] Although it recognized that Sanzari was not directly involved in the generation, storage, treatment, or disposal of hazardous wastes, it determined that he had nevertheless taken actions that justified assigning the Sanzari Appellees a significant percentage of the costs. For example, Sanzari failed to provide Goldstein with a full set of the preliminary test results from the monitoring wells and with information regarding TCE contamination on a nearby plot of land before Goldstein opted to proceed with purchasing the Property. The Court explained that Sanzari was "the only party that had notice of the full extent of the contamination prior to Goldstein's election yet acted in a manner which would ensure that someone else—Goldstein—would have to take the responsibility for the remediation." *Litgo I*, 2010 WL 2400388, at \*39. Additionally, one of Sanzari's environmental contractors installed a monitoring well with a faulty seal, and this seal, "which was discoverable and fixable," likely increased the extent of contamination. *Id*. at \*38.

---

[3] Initially, the District Court allocated 25% of the costs to the Sanzari Appellees, based in part on its determination that they should have taken more action to remediate the conditions at the JANR warehouse. Upon careful consideration of the parties' motions to reconsider, however, the Court found that the Sanzari Appellees did, in fact, behave reasonably with respect to the JANR warehouse, and it decreased their share of the responsibility by 4%. It determined that the Litgo Appellants' share should accordingly be increased by 4%.

18

The District Court found that the Litgo Appellants were responsible for 54% of the response costs. It found them liable as PRPs "based solely on their current ownership and operation of the Litgo Property," and acknowledged that they had not been directly involved in the generation, storage, treatment, or disposal of hazardous wastes. *Id*. at \*39. It also acknowledged that the Litgo Appellants' only activities on the site "have been those necessary to remove and remediate the soil and groundwater contamination." *Id*. The Court found, however, that the Litgo Appellants had consistently put off taking any steps to remediate the groundwater contamination, and this lack of action may have increased the threat to the environment and the public. Additionally, Goldstein, in the Sales Agreement, had agreed to remediate the Property in accordance with ECRA, and accepted financial responsibility for remediation beyond the first $100,000. Although he did not know specifically that there was TCE contamination, he was aware that there were significant environmental issues, and voluntarily assumed that risk. The District Court also noted that the Litgo Appellants were the only parties that stood to benefit financially from the remediation of the Property.

The United States Appellees, in contrast, were allocated only 2% of the costs. The Court noted that they had previously generated and possessed some of the hazardous substances that were transferred to the JANR warehouse, and that some of those substances may have been released there. However, it explained that the United States Appellees had not been involved in the transportation of the substances to the Litgo Property, in their storage in the JANR warehouse, or in their treatment and disposal. It also found that the United States Appellees had exercised reasonable care

regarding the transportation of the substances by entrusting them to a hazardous waste disposal contractor who, at the time, was considered reputable. It explained that, "[a]lthough the United States [Appellees] arranged for the disposal of these wastes, the materials they generated appear to have reached the JANR warehouse only due to the inappropriate and potentially illegal conduct of other third-party actors not involved in the suit." *Litgo II*, 2011 WL 65933, at *6.

The District Court then determined that the poor execution of the JANR warehouse cleanup—which had been overseen by NJDEP—had contributed to the contamination at the Litgo Property. Because of Eleventh Amendment immunity, however, NJDEP could not be held liable. The Court thus assigned the NJDEP Commissioner an "orphan share" of 23% of the costs.[4] It then distributed these costs among the PRPs. After this recalculation, the Sanzari Appellees were ultimately responsible for 27% of the costs, the Litgo Appellants were responsible for 70% of the costs, and the United States Appellees were responsible for 3% of the costs.

---

[4] When a court cannot "assign an ideal measure of monetary responsibility to an otherwise responsible party"—because, for example, that party is immune from suit, bankrupt, or defunct—this gives rise to an orphan share. *United States v. Kramer*, 953 F. Supp. 592, 595 (D.N.J. 1997). A court may equitably allocate orphan shares among liable parties at its discretion. *Stearns & Foster Bedding Co. v. Franklin Holding Corp.*, 947 F. Supp. 790, 801 (D.N.J. 1996).

Both the Litgo Appellants and the Sanzari Appellees raise multiple challenges to the District Court's analysis of the CERCLA claims. First, the Litgo Appellants contend that the District Court incorrectly identified who could be held liable as PRPs under CERCLA. They claim that the United States Appellees should have been liable as past owners based on their involvement in Columbia Aircraft's manufacturing operations, and that the Litgo Appellants should not have been found liable as current operators. Second, both the Litgo Appellants and the Sanzari Appellees contend that the District Court abused its discretion in allocating costs among the liable parties. Third, the Sanzari Appellees argue that the District Court erred in failing to assign it a settlement credit, based on the United States Appellees' stipulation to the amount of damages. Finally, the Litgo Appellants contend that the District Court erred in denying their request for prejudgment interest. We address each of these contentions in turn.

## B. PRP Liability

### 1. "Current Operator" Liability

The District Court did not err in finding that the Litgo Appellants were liable as current operators under CERCLA. An operator is "someone who directs the workings of, manages, or conducts the affairs of a facility." *United States v. Bestfoods*, 524 U.S. 51, 66 (1998).[5] For that role to subject

---

[5] The Litgo Property is undisputedly a "facility" for CERCLA purposes. *See* 42 U.S.C. § 9601(9) ("facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located").

someone to CERCLA liability, the operator must "manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66–67. Here, the District Court found that the Litgo Appellants were actively involved in activities related to the contamination on the Litgo Property: not only did the Litgo Appellants have the actual authority to make decisions about compliance with environmental regulations, they hired environmental consultants to conduct tests and remediation operations on the Litgo Property, and they oversaw that work.

Relying on *United States v. Bestfoods*, the Litgo Appellants argue that they should not be held liable as current operators because they have only managed remedial activities on the site. That is, they argue, they have not engaged in any operations that *caused* further contamination, so they have not been involved in "operations specifically related to pollution," *id.* at 66. This interpretation reads *Bestfoods* far too narrowly, and is contrary to CERCLA's liability scheme.

Under CERCLA, current operators—like all other classes of PRPs—are held strictly liable for all releases that occur at a facility. *See Burlington N.*, 556 U.S. at 608 (citing 42 U.S.C. § 9607(a)). The statute does not require a showing that the operator was directly responsible for the release of a hazardous substance for PRP liability to attach. *See* 42 U.S.C. § 9607(a) (PRP liability attaches when a current "owner [or] operator of . . . a facility . . . *from which there is a release*, or a threatened release which causes the incurrence of response costs, of a hazardous substance." (emphasis added)); *Alcan Aluminum Corp.*, 964 F.2d at 264–66. Indeed, in the case of a current operator, as opposed to a past

operator, the plaintiff is not even required to show that the party was an operator when an active "disposal" of hazardous waste occurred. *Compare* 42 U.S.C. § 9607(a)(1) (PRP status applies to "the owner and operator of a vessel or a facility"), *with* 42 U.S.C. § 9607(a)(2) (PRP status applies to "any person who *at the time of disposal of any hazardous substance* owned or operated any facility at which such hazardous substances were disposed of" (emphasis added)). The plaintiff need only show that the party engaged in operations related to pollution and that a "release" of hazardous substances occurred, a requirement that can be met by showing that there was a passive migration of waste. *See United States v. CDMG Realty Co.*, 96 F.3d 706, 715 (3d Cir. 1996) (citing 42 U.S.C. § 9601(22)); *see also id.* at 714 ("disposal," by contrast, requires more than passive migration of contaminants).

A determination that current operators cannot be held liable unless they have actually engaged in polluting activities would require us to disregard the distinction between past and present operators set out in the statute. *See id.* at 715 (explaining that Congress must have intended for current owners and operators and past owners and operators to be liable under different circumstances, as it distinguished between the two in the definition of PRP). It would also add a causation requirement that is not found in the text.[6] The

---

[6] Nor does this requirement have strong support in case law. The Litgo Appellants cite to *Universal Paragon Corp. v. Ingersoll-Rand Co.*, 2007 WL 518828, at *5 (N.D. Cal. Feb. 13, 2007), in which a district court refused to impose operator liability when the party "had no involvement in the contaminating activities." Litgo Br. 32. But there, the district

Supreme Court has recognized that, under CERCLA's broad liability scheme, "even parties not responsible for contamination may fall within the broad definitions of PRP," *Atl. Research Corp.*, 551 U.S. at 136 (citing 42 U.S.C. § 9607(a)(1)), and, contrary to the Litgo Appellants' suggestion, the Supreme Court's decision in *Bestfoods* does not create an exception for "innocent" operators. *Bestfoods* addresses when a parent company can be held directly responsible for the activities of its subsidiary as an "operator." In defining "operator," the Supreme Court employed broad, passive language: an operator is one who is involved in operations "*having to do with* the leakage or

court appears to conflate the requirements for being a current owner with the requirements for being a past owner, so the opinion is not especially persuasive. The Litgo Appellants also cite to *Bob's Beverage, Inc. v. ACME, Inc.*, a district court case asserting that "a person must affirmatively act to cause a release of hazardous waste to become an operator." 169 F. Supp. 2d 695, 721 (N.D. Ohio 1999). This requirement, as discussed above, is not found in CERCLA. Nor is it found in *United States v. Township of Brighton*, 153 F.3d 307 (6th Cir. 1998), the Sixth Circuit case on which *Bob's Beverage* relies. *Township of Brighton* states only that an operator must be actively involved on the site in some way that relates to the pollution; it does not provide that the operator must have caused the release. *See id.* at 314–15. In any event, the Litgo Appellants did exercise actual control over pollution-related operations at the Litgo Property by taking affirmative actions: they conducted tests and hired contractors to perform remediation operations on the property.

disposal of hazardous waste," *Bestfoods*, 524 U.S. at 66–67 (emphasis added), not one who is involved in operations "causing" or "leading to" the leakage or disposal of waste. Moreover, the Court expressly noted that operator liability may be imposed when a party is responsible for "decisions about compliance with environmental regulations," *id*. at 67, a description which directly applies to the Litgo Appellants' activities at the Property.[7]

This interpretation does not—as the Litgo Appellants suggest—lead to unfair consequences. Although CERCLA's strict liability regime may subject "innocent" private parties to liability, *see Atl. Research Corp.*, 551 U.S. at 136, innocent owners and operators do have some protection. After identifying PRPs, courts allocate response costs based on equitable factors. An operator who has participated in remediation without slowing or interfering with that process likely will not be assessed a large share of the remediation costs, if it is assessed any at all. *See, e.g.*, *Am. Color & Chem. Corp. v. Tenneco Polymers, Inc*., 918 F. Supp. 945, 959–60 (D.S.C. 1995) (0% to current owner and operator);

---

[7] The Litgo Appellants also cite to several district court cases suggesting that mere investigation into contamination will not, by itself, subject a party to current operator PRP liability. *See City of Grass Valley v. Newmont Mining Corp.*, 2007 WL 4287603, at *5 & n.3 (E.D. Cal. Dec. 4, 2007); *Spectrum Int'l Holdings, Inc. v. Universal Coops., Inc.*, 2006 WL 2033377, at *2, *5–6 (D. Minn. July 17, 2006). But the Litgo Appellants have been actively involved in remediation operations on the site, so we need not here decide whether purely investigative activities could subject a party to operator liability.

*Alcan-Toyo Am., Inc. v. N. Ill. Gas Co.*, 881 F. Supp. 342, 346–47 (N.D. Ill. 1995) (10% to current owner). An operator who *has* delayed with remediation, however, may still receive a share of the remediation costs, *see Bedford Affiliates v. Sills*, 156 F.3d 416, 430 (2d Cir. 1998), *abrogated on other grounds by W.R. Grace & Co.—Conn. v. Zotos Int'l, Inc.*, 559 F.3d 85, 90 (2d Cir. 2009), in accordance with CERCLA's purpose of encouraging prompt cleanup, *see Burlington N.*, 556 U.S. at 602.

### 2. "Past Owner" Liability

The District Court did not err in finding that the United States Appellees are not "past owners" based on their involvement at the Columbia Aircraft manufacturing site; they are PRPs only because they arranged for the disposal of hazardous substances that may have eventually been released at the JANR warehouse.

A party may be liable as a past owner when, "at the time of disposal of any hazardous substance," it "owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). CERCLA defines "facility" broadly as:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located.

42 U.S.C. § 9601(9). The District Court found that there were only two relevant "facilities" at which hazardous substances had been disposed in this case—the Litgo Property (as a "site or area"), and the vapor degreasers used to clean the precision parts (as "equipment"). It found that the United States Appellees did not own either of those facilities.

The Litgo Appellants raise two challenges to the District Court's determination. First, they argue that the evidence shows that the government-owned equipment leased by Columbia Aircraft—which clearly falls within the definition of a "facility"—was cleaned using TCE, and this constitutes a disposal of hazardous waste. Second, they claim that the United States Appellees' ownership of some of the equipment used in Columbia Aircraft's manufacturing process is sufficient to subject them to ownership liability.

The Litgo Appellants' first challenge is meritless. The District Court found that the precision parts manufactured by Columbia Aircraft were degreased using TCE as a solvent, but it rejected the claim that TCE was used to clean the equipment used in the manufacturing process. The Litgo Appellants' expert did testify that TCE was commonly used at the time to service electrical motors and other parts of machinery. This testimony, however, was focused on the use of TCE to degrease airplane parts. When asked whether TCE would have been used "on the equipment itself," the expert responded only that it was a "possibility." He also testified that other solvents, like acetone, could have been used instead of TCE. Thus, the District Court's factual determination that there was no direct relationship between the government-

27

owned equipment and the TCE solvents was not clearly erroneous.

The Litgo Appellants also claim that the United States Appellees were "owners" of a facility where TCE was disposed during the 1940s because they owned part of a "process installation"—that is, they owned machinery and equipment that was a necessary part of the manufacturing process. In particular, the United States Appellees owned some of the equipment that Columbia Aircraft used to manufacture precision parts, and Columbia Aircraft disposed of TCE when it degreased those parts later in the production process, using separate machinery (vapor degreasers). The Litgo Appellants, relying primarily on *United States v. Saporito*, 684 F. Supp. 2d 1043 (N.D. Ill. 2010),[8] argue that this is enough to subject the United States Appellees to past owner liability. We disagree.

---

[8] The Litgo Appellants also rely on *American International Specialty Lines Insurance Co. v. United States*, 2010 WL 2635768 (C.D. Cal. June 30, 2010), which states that there need not be evidence that any specific piece of equipment owned by the defendant was responsible for a specific release; "[i]t is enough that the components owned by the defendant were 'a necessary part' of the manufacturing process." *Id.* at *23 (citing *Saporito*, 684 F. Supp. 2d at 1056). However, in *American International Specialty Lines*, some of the government-owned equipment was directly involved in the release of hazardous waste. For example, the government owned "grinders" that created perchlorate dust, one of the waste products at issue in the case. *Id.* at *8−9. These grinders were then cleaned with VOCs, including TCE. *Id*.

Under the Litgo Appellants' view, if a party owns any equipment used at a manufacturing site, it can be held responsible for the disposal of hazardous waste that occurs at other pieces of equipment elsewhere at the site, as long as the two pieces of equipment are part of the same overarching "process." This broad definition of facility finds no support in CERCLA.

The term "process installation" is not used in CERCLA's definition of "facility," although "installation" is mentioned.[9] Installation generally means "a thing installed, in particular: a large piece of equipment installed for use." Concise Oxford American Dictionary 464 (2006); *see also* Random House Dictionary of the English Language 988 (2d ed. 1987) (defining installation as "something installed, as machinery or apparatus placed in position or connected for use"). It is a physical item: a piece of machinery or equipment that has been installed. This fits well with the other types of "facility" listed in the definition, all of which are physical. *See Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990) ("[W]ords grouped in a list should be given related meaning."). The Litgo Appellants' attempt to define "installation" more conceptually—as a process, potentially made up of various discrete pieces of machinery that may or may not be located near each other or used together—is not supported by the statutory language.

---

[9] "Process installation," as far as we can tell, is simply a phrase used by the Litgo Appellants' counsel and expert during the expert's testimony. *See* App. 2757. It does not appear in other cases, and the Litgo Appellants do not explain the term's origin.

It may nevertheless be possible for two pieces of equipment to be sufficiently close in relation to each other that they should be considered components in a larger piece of machinery (which may, itself, be "equipment" or an "installation"). *See, e.g.*, *Saporito*, 684 F. Supp. 2d at 1057 (determining that the party was liable based on ownership of necessary equipment in a plating line). Here, however, the District Court reasonably determined that no such relationship between the government-owned equipment and the vapor degreasers existed. There is no suggestion that the equipment owned by the United States Appellees was in any way attached to the vapor degreaser tanks that disposed of waste or used in close connection with them. The only relationship between the vapor degreasers and the United States Appellees' equipment is that both were used by Columbia Aircraft to manufacture precision parts. They were not, however, used at the same stage of the production process. Accordingly, we will uphold the determination that there was insufficient evidence to connect the equipment owned by the United States Appellees to the disposal or release of hazardous substances, and that the United States Appellees thus were not past owners under CERCLA.

## C. Allocation of Costs

The Litgo Appellants and Sanzari Appellees argue that the District Court's allocation of costs under CERCLA was an abuse of discretion.[10] In our view, the District Court

---

[10] The Litgo Appellants also contend that the District Court abused its discretion when it declined to hold a separate hearing on how costs should be allocated among the PRPs, and instead allocated costs after the seventeen-day bench trial on the merits. Courts may hold a separate hearing to allocate

carefully and judiciously compared the parties' relative fault both in its initial opinion on the merits and upon reconsideration.

First, the parties challenge multiple findings of fact upon which the District Court relied in allocating costs, including: (1) that the Sanzari Appellees' environmental consultant installed a faulty seal on one of the monitoring wells; (2) that the Sanzari Appellees failed to deliver a full set of preliminary groundwater test results and failed to disclose information about TCE contamination on a nearby property; (3) that the Litgo Appellants deliberately slowed the remediation process; (4) that the Litgo Appellants, unlike the other PRPs, stood to benefit from the remediation; and (5) that the United States Appellees exercised reasonable care in hiring a reputable contractor to transport the waste. They also claim that the District Court should have found that the United States Appellees did not cooperate with NJDEP's cleanup of the JANR warehouse.

---

costs, and sometimes choose to do so. *See, e.g.*, *United States v. Davis*, 261 F.3d 1, 16 (1st Cir. 2001) (describing three phases of a trial on a § 107(a) claim involving over 100 defendants). But CERCLA does not *require* courts to conduct a separate allocation hearing. *See Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 82 (1st Cir. 1999) ("CERCLA does not demand a bifurcated trial on this score, nor have we insisted that the many knotty issues that arise in the typical CERCLA action be resolved in any particular chronological order."). Here, the Litgo Appellants did not even request a bifurcated trial—the United States Appellees did—and the District Court reasonably determined that separate proceedings were unnecessary in this case.

After carefully reviewing the record, we cannot conclude that any of these findings of fact was clearly erroneous. With respect to the faulty monitoring well, the United States Appellees' expert testified that the cement seal that was supposed to be around the monitoring well "was missing, had degraded or crumbled, or maybe was never installed properly in the first place." *See* App. 3663. From this testimony, the District Court could reasonably infer that some mistake had occurred during the installation process—either the seal was never secured properly, or it became loose over time because of the manner in which it was installed.

There is also sufficient evidence to support the District Court's finding that the Litgo Appellants did not receive a full set of preliminary test results and that the Sanzari Appellees did not disclose information about contamination at a nearby property. At trial, the Litgo Appellants introduced an April 1989 letter from Sanzari's attorney to Goldstein's attorney. The letter included information about some of the contaminants on the Property but omitted information about VOCs, including TCE. *See* App. 6192. Although the Sanzari Appellees argue that the relevant information may have been provided shortly thereafter, at a time when Goldstein still had the opportunity to back out of the transaction, the District Court was not required to so find. The Litgo Appellants also presented evidence at trial showing that there was contamination at a well close to the Property that the Sanzari Appellees were aware of, but did not disclose. *See* App. 5346 (letter to Sanzari from Ken Hortsman stating that he had instructed the environmental consultant not to include information about the alleged existence of groundwater contamination in Bridgewater, New Jersey in his report to NJDEP); App. 4142–46 (testimony regarding the

32

contamination of the nearby property and the Hortsman letter). Again, while the Sanzari Appellees dispute the inferences that may be drawn from these communications and testimony, it was not clear error for the District Court to rely on them.

The record also supports the District Court's finding that the Litgo Appellants deliberately slowed the remediation process. For example, Goldstein's deposition testimony, used at trial for impeachment purposes, suggests that he instructed the consultants to slow down the groundwater investigation:

> [Q:] You're saying that [the consultant] recommended to you that you should stall the DEP?
>
> [A:] No. No professional would ever recommend to stall. He felt that we should do what the DEP is saying we should do, but not— not as fast as they're looking for, but don't stall. I mean, you know, I don't think any professional would ever stall the DEP.
>
> . . .
>
> [Q:] Well, wasn't he actually recommending to you that you offer as a more aggressive approach to delineate the groundwater in the southeast and propose a mediation technique for—
>
> . . .
>
> [A:] I told him that I was not interested at this point in doing and learning how bad this thing

is going to be because he was talking astronomical numbers and we should just not get boxed in to where it may cost me five or six million dollars.

*See* App. 1416; *see also* App. 1418 (Goldstein wanted to "go very slowly" because the contamination "could be a monstrous thing"). The District Court reasonably found that "groundwater contamination continues to migrate downstream," and so the Litgo Appellants' "lack of action over the past twenty years may well have increased the threat to the environment and public health." App. 126; *see also* App. 2175–76 (plumes are continuing to migrate).

Nor was the District Court's determination that the Litgo Appellants were the only parties that stood to benefit from the remediation clearly erroneous. Because of the contamination, the Litgo Property is currently unusable and cannot be developed. If the land could be developed after remediation, it would increase its value, and the Litgo Appellants are the only parties that stand to benefit from such an increase. *See Alcan-Toyo Am., Inc.*, 881 F. Supp. at 347 (finding that the current owner was the only party that would "reap the benefits of the environmental cleanup of its property," and so it should bear a portion of the costs).

The District Court's findings with respect to the United States Appellees were also supported by the record. The Litgo Appellants and Sanzari Appellees claim there was insufficient evidence to show that the United States Appellees exercised reasonable care in disposing of waste. They argue that the only evidence supporting the Court's finding was testimony from an NJDEP witness, who stated that NJDEP believed at the time that RTS, the contractor the United States

34

Appellees used, was reputable. This testimony suffices. NJDEP's testimony as to its own views about the contractor could support an inference that the contractor had a good reputation at that time. Finally, the record does not mandate a finding that the United States Appellees failed to cooperate with NJDEP in cleaning up the JANR warehouse. As the District Court explained, NJDEP contacted the United States Appellees in an attempt to identify the source of the contaminants in the warehouse, but there was no testimony suggesting that NJDEP ever asked or expected the United States Appellees to help remove the hazardous substances at that time. Thus, the District Court reasonably concluded that the United States Appellees did not "fail to cooperate" with NJDEP.

The Litgo Appellants and the Sanzari Appellees assert further challenges both to the particular factors considered by the District Court and the weight given to each. CERCLA does not specify which factors courts must consider in allocating costs among responsible parties; instead, it provides that, "[i]n resolving contribution claims, the court may allocate response costs among liable parties using *such equitable factors as the court determines are appropriate*." 42 U.S.C. § 9613(f) (emphasis added). This provision affords district courts tremendous discretion. As we have previously explained, "[c]ourts examining this language and its history have concluded that Congress intended to grant the district courts significant flexibility in determining equitable allocations of response costs, without requiring the courts to prioritize, much less consider, any specific factor." *Beazer E.*, 412 F.3d at 446.

Some of the factors frequently considered by courts, taken from an unsuccessful amendment to CERCLA, are

known as the "Gore factors." *See Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889, 899 (5th Cir. 1993).  They include:

> (i) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;
>
> (ii) the amount of the hazardous waste involved;
>
> (iii) the degree of toxicity of the hazardous waste involved;
>
> (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
>
> (v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and
>
> (vi) the degree of cooperation by the parties with the Federal, State or local officials to prevent any harm to the public health or the environment.

*Id.* at 899–900 (internal alteration omitted); *United States v. Kramer*, 644 F. Supp. 2d 479, 493 n.13 (D.N.J. 2008).

Courts are not, however, bound to consider each of the Gore factors, nor are they limited to considering only the

Gore factors. *Beazer E.*, 412 F.3d at 446; *Envtl. Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 507 (7th Cir. 1992) (§ 9613(f) "does not limit courts to any particular list of factors, nor does the section direct the courts to employ any particular test"). Nevertheless, both the Litgo Appellants and the Sanzari Appellees argue that the District Court should have given more weight to the fact that the United States Appellees were the only identified generators of waste, and the fact that the Litgo Appellants and the Sanzari Appellees did not contribute anything to the contamination. They also claim that the District Court erred in failing to take into consideration the United States Appellees' business relationship with Columbia Aircraft.

The Court thoroughly compared the role the United States Appellees played in the contamination with that of the Litgo Appellants and the Sanzari Appellees—parties whose active concealment or resistance to remediation may have worsened the conditions at the Litgo Property. The United States Appellees arranged for hazardous waste to be disposed of by what was then considered to be a reputable contractor, and the waste reached the JANR warehouse only because of third-party actors.

Nor did the Court abuse its discretion in declining to consider the United States Appellees' relationship with Columbia Aircraft in the 1940s. The District Court found that it would be "inappropriate" to assign the United States Appellees additional costs based on conduct that would not subject them to CERCLA liability. The Litgo Appellants and Sanzari Appellees argue that courts have broad discretion in considering equitable factors when allocating responsibility, and these factors could include both the fact that the United States Appellees leased Columbia Aircraft equipment and the

37

fact that Columbia Aircraft was assisting with the war effort. *See, e.g.*, *United States v. Shell Oil Co.*, 294 F.3d 1045, 1060 (9th Cir. 2002). Although the United States Appellees' relationship with Columbia Aircraft may be a factor that the Court could have considered in allocating costs, the decision not to take that factor into account was well within the Court's discretion, and is not reversible error.

The Litgo Appellants and the Sanzari Appellees also challenge the significant size of their own shares of responsibility, given that they were deemed PRPs as owners and operators, rather than as parties directly involved in the disposal of waste. As the Litgo Appellants point out, it may be unusual for an owner or operator who played no role in the discharge to be allocated such a large percentage of the costs. *See, e.g.*, *Am. Color & Chem. Corp.*, 918 F. Supp. at 959–60 (0% to current owner); *Bedford Affiliates*, 156 F.3d at 430 (5% to current owner); *Alcan-Toyo Am., Inc.*, 881 F. Supp. at 346–47 (10% to current owner). In most of the cases they cite, however, the current owners did not take steps to delay the remediation process, or to conceal the contamination problem. *Compare Am. Color & Chem. Corp.*, 918 F. Supp. at 959–60 (owner did not contribute to release and fully cooperated with state and local officials), *with Bedford Affiliates*, 156 F.3d at 430 (fact that owner delayed cleanup served as an "independent basis for imposing some liability"). And perhaps more importantly, in each of these cases, one of the PRPs was directly responsible for the release or discharge of waste, so it was reasonable to allocate a substantial portion of the costs to that party. *See Am. Color & Chem. Corp.*, 918 F. Supp. at 948, 959–60 (party whose activities resulted in the discharge of waste held fully responsible); *Bedford Affiliates*, 156 F.3d at 422, 430 (party at fault assigned 95% of the

38

responsibility); *Alcan-Toyo Am., Inc.*, 881 F. Supp. at 345, 347 (companies that deposited coal tar at site held responsible for 90% of future costs). Here, the most responsible parties—Columbia Aircraft, Signo, JANR, and NJDEP—either were not joined as parties in the suit, or could not be sued under CERCLA.[11] Thus, the unavailability of the most responsible parties accounts for the relatively high allocations assigned to the Litgo Appellants and the Sanzari Appellees.

The Sanzari Appellees raise several additional equitable claims, which require only brief discussion. First, they claim that the Court should have taken into account the settlement agreements that Goldstein reached with two other parties—Dande Plastics and Wausau Insurance—during the 1996 proceedings. *See K.C.1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1017–18 (8th Cir. 2007) (stating that courts should generally take settlements into account to avoid duplicate recovery). Although the Court did not rely on the settlement agreement in determining the Litgo Appellants' allocation of responsibility, it did deduct the amount that the Litgo Appellants had received in these settlements from the total remediation costs, which avoided the problem of duplicate recovery.

Second, the Sanzari Appellees claim that the District Court should have considered prior litigation positions taken by Goldstein in its suit against EWMA. The Sanzari Appellees contend that Goldstein's allegations of negligence

_____

[11] The NJDEP Commissioner was immune from suit under the Eleventh Amendment, Columbia Aircraft was defunct long before the suit began, and the parties do not explain why Signo and JANR were not joined.

and substandard services were essentially admissions that the Litgo Appellants paid too much for the remedial services that they received, and the District Court should have taken those admissions into account. The Sanzari Appellees point to no case law suggesting that courts are *required* to take prior inconsistent positions into account in allocating remediation costs. *See Alcan-Toyo Am., Inc.*, 881 F. Supp. at 346–47 (explaining that "estoppel . . . *may be* considered in the allocation of contribution shares" (emphasis added)). In any event, the Sanzari Appellees ignore that the District Court did take into account the Litgo Appellants' prior allegations against its own consultant in its damages determination.

Third, the Sanzari Appellees claim that the District Court failed to fully account for the nature of the Sales Agreement between Sanzari and Goldstein. Pursuant to the Sales Agreement, Goldstein agreed to assume Sanzari's environmental obligations, and he was assigned the right to pursue claims against Sanzari's former tenants and others. He used the assignment to pursue Sanzari's insurer, Sanzari's environmental consultants, and Dande Plastics in the 1996 litigation. A review of the record shows, however, that the District Court did give weight to Goldstein's assumption of risk when it assigned the Litgo Appellants 70% of the remediation costs. It also took into account Sanzari's failure to disclose relevant information to Goldstein before he chose to assume that risk. The District Court's balancing of these two factors was not an abuse of discretion.[12]

---

[12] We further note that, contrary to the Litgo Appellants' and Sanzari Appellees' contentions, there is nothing inconsistent about the District Court's finding that, although Sanzari failed to disclose all relevant information

Finally, the Sanzari Appellees contend that the District Court erred in holding them responsible for the costs of soil remediation, in addition to the costs of groundwater remediation. The Sanzari Appellees argue that they were candid with the Litgo Appellants about the possibility of soil contamination. They also claim that, even if they were responsible for the installation of a faulty well, that defect would have only increased groundwater—not soil—contamination. The District Court addressed these arguments in its opinion on the motions for reconsideration. It explained that it "had taken this argument into consideration as one of the factors in its decision to reduce the Sanzari Appellees' final allocation to 27%," but that it did not believe that it was necessary to separate the costs. Sanzari's failure to disclose had consequences that extended beyond responsibility for the groundwater contamination alone, and the Court did not clearly err in holding the Sanzari Appellees responsible for part of the costs of soil remediation.

## D. Settlement Credit

After the hearing on liability and allocation of costs, the United States Appellees and the Litgo Appellants reached an agreement on damages. They stipulated that the Litgo Appellants had incurred $1,729,279 in CERCLA response

---

about the contamination on the Property, Goldstein appreciated that there were risks involved in the transaction when he entered into the Sales Agreement. Goldstein had ample information suggesting that contamination was an issue and could be costly; he simply did not have the specific test results that Sanzari withheld, showing that it was, in fact, going to be very costly.

41

costs, and that the United States Appellees owed $51,878.37 (3% of the total damages). Following the damages hearing, the District Court determined that the Litgo Appellants actually had incurred $1,566,236.78 in recoverable costs—an amount less than had been stipulated. The Sanzari Appellees argue that they should have received a credit for the 3% difference between the amount stipulated and the amount of the Litgo Appellants' actual damages. Otherwise, they contend, the Litgo Appellants will be overcompensated for the remediation costs that they incurred.

As the Sanzari Appellees note, CERCLA is designed to permit plaintiffs to recover costs expended, or costs that will need to be expended. It includes certain provisions to ensure that plaintiffs do not receive a windfall. *See, e.g.*, 42 U.S.C. § 9613(f)(2) (explaining that a settlement that resolves a person's liability to the United States or a State "reduces the potential liability of the others by the amount of the settlement"); *see also* 42 U.S.C. § 9614(b) ("Any person who receives compensation for removal costs or damages or claims pursuant to this chapter shall be precluded from recovering compensation for the same removal costs or damages or claims pursuant to any other State or Federal law."). These provisions do not directly apply to the situation here—that is, where a government entity has resolved its liability to a non-governmental entity in a settlement agreement. There is nothing in the statutory language mandating that the District Court give the Sanzari Appellees a settlement credit.

Based on CERCLA's general policy against double recovery, however, courts have found that prior settlements not governed by 42 U.S.C. § 9613(f)(2) should be taken into account as an equitable factor in allocating responsibility and

42

awarding damages. *See, e.g.*, *K.C.1986 Ltd. P'ship*, 472 F.3d at 1017–18 (finding that a district court abused its discretion when it "neither credited [prior] settlements against the judgment nor articulated an equitable reason for not doing so," *id*. at 1018); *see also Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1189 (9th Cir. 2000) (treating the existence of prior settlements as an equitable factor to be considered). Here, the District Court took into account other settlements that the Litgo Appellants had previously entered into. It determined that a credit to the Sanzari Appellees based on the stipulation was not appropriate, but did not explain why.

Although the District Court did not explicitly state why it refused to award a settlement credit, it clearly recognized the importance of avoiding double recovery, as it subtracted the other settlement awards the Litgo Appellants had received from the total remediation costs. The Court provided a thorough and detailed discussion of other equitable factors that it considered, including the Sanzari Appellees' conduct, and these other factors may have led the Court to believe that a settlement credit of $4,891.27—less than one percent of the total costs being allocated among the parties—was not warranted. Although the Court should have explained its reasoning in denying the additional settlement credit, this determination was a very small part of the allocation process, and we are confident that the Court recognized the relevant factors and considered them. *Cf. Beazer E.*, 412 F.3d at 446 (district court abused its discretion when it gave one equitable factor undue weight and, in doing so, entirely failed to consider another factor). We thus hold that the District Court's refusal to credit the Sanzari Appellees for the United States Appellees' overpayment is not reversible error.

43

## E. Prejudgment Interest

Although we agree almost entirely with the District Court's thorough assessment of the parties' CERCLA claims, we will reverse its order to the extent that it denied the Litgo Appellants' request for prejudgment interest under CERCLA § 107(a).

An award of prejudgment interest under § 107(a) of CERCLA is mandatory. *Caldwell Trucking PRP v. Rexon Tech. Corp.*, 421 F.3d 234, 247 (3d Cir. 2005); *see also* 42 U.S.C. § 9607(a) ("The amounts recoverable in [a § 107(a) action] *shall include* interest." (emphasis added)). The Sanzari Appellees recognize that the Litgo Appellants brought this case as a § 107(a) cost recovery action, but argue that when the Appellees sought contribution from the Litgo Appellants and each other, "the case effectively became a straight allocation case, subject to Section 113(f)." Sanzari Br. 76. They contend that prejudgment interest is discretionary under § 113(f).

The Sanzari Appellees' argument mischaracterizes the nature of the proceedings between the Litgo Appellants and Appellees. Because they bore the costs of remediation, the Litgo Appellants were entitled to bring suit to recover costs against the Appellees under § 107(a), *Atl. Research Corp.*, 551 U.S. at 139, and they did so. Although Appellees properly sought contribution from each other and from the Litgo Appellants under § 113(f), this did not transform the case into a "straight allocation case" and eliminate the Litgo Appellants' § 107(a) claim. Indeed, Appellees' right to bring a suit for contribution was premised on a finding of liability under § 107(a). As the Supreme Court explained in *Atlantic Research*:

44

[T]he remedies available under §§ 107(a) and 113(f) complement each other by providing causes of action to persons in different procedural circumstances. Section 113(f)(1) authorizes a contribution action to PRPs with common liability stemming from an action instituted under ... § 107(a). And § 107(a) permits cost recovery (as distinct from contribution) by a private party that has itself incurred cleanup costs.

551 U.S. at 139 (internal quotation marks and citations omitted); *see also id*. at 138–39 ("The statute authorizes a PRP to seek contribution '*during or following*' a suit under ... § 107(a)." (emphasis added)). Therefore, the Litgo Appellants' claim was a § 107(a) claim.

Because the imposition of prejudgment interest under § 107(a) is mandatory, the Sanzari Appellees' equitable arguments against the imposition of interest are unavailing. The Litgo Appellants recovered under § 107(a), so they are entitled to prejudgment interest. We will therefore remand for the District Court to calculate that interest.

## IV. Spill Act Claims

Like CERCLA, the Spill Act permits courts to "allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate." N.J. Stat. Ann. § 58:10-23.11f(a)(2)(a). The District Court determined that both the Litgo Appellants and the Sanzari Appellees were liable under the Spill Act for response costs incurred for petroleum-related soil contamination. Based on the same factors considered for

CERCLA cost allocation, it allocated 67% of the costs to the Litgo Appellants and 33% of the costs to the Sanzari Appellees.

The Sanzari Appellees argue that the District Court erred in assigning them liability under the Spill Act because they did not own or transport any of the hazardous materials stored in the JANR warehouse, nor did they exercise control over the warehouse at the time of NJDEP's botched cleanup in the 1980s. We disagree.

Under the Spill Act, if a party owns property at the time of a discharge, they are responsible for that discharge. *See N.J. Dep't of Envtl. Prot. v. Dimant*, 51 A.3d 816, 829–30 (N.J. 2012) (citing *Marsh v. N.J. Dep't of Envtl. Prot.*, 703 A.2d 927, 931 (N.J. 1997)); *see also* N.J. Admin. Code § 7:1E-1.6 (defining "person responsible for a discharge" to include "[e]ach owner or operator of any facility, vehicle or vessel from which a discharge has occurred"). For liability to attach, the plaintiff must also show that there was a "reasonable nexus" between the discharge of waste for which the defendant is responsible and the contamination on the site. *Dimant*, 51 A.3d at 832–33, 835 (holding that there was an insufficient nexus between the discharge caused by the defendant and the contamination at the site when there was no evidence connecting fluid leaking onto a paved driveway with any of the complained-of contamination found in residential wells). Here, the Sanzari Appellees were the owners of the Litgo Property when hazardous waste was stored at the JANR warehouse, and when NJDEP disposed of that hazardous waste improperly. Because evidence presented at trial connected the JANR warehouse discharge to the contamination at the Litgo Property, the District Court did not err in concluding that the Sanzari Appellees were liable under

46

the Spill Act.  Nor did the District Court err in allocating Spill Act costs, for the same reasons we discussed regarding the CERCLA cost allocation.

## V.  RCRA Claims

RCRA was enacted "to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996).  To accomplish this goal, RCRA permits citizen suits against any person who has contributed or is contributing to the handling or disposal of waste "which may present an imminent and substantial endangerment to health or the environment," and authorizes district courts to issue injunctions to alleviate that harm.  42 U.S.C. § 6972(a)(1)(B).  Courts may also "award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or substantially prevailing party, whenever the court determines such an award is appropriate."  42 U.S.C. § 6972(e).

The District Court granted summary judgment in favor of the Sanzari Appellees on the Litgo Appellants' RCRA claim, based on New Jersey's entire controversy doctrine.  Under that doctrine, all claims which arise from related facts or the same transaction or series of transactions must be joined together.  *DiTrolio v. Antiles*, 662 A.2d 494, 502 (N.J. 1995).  If a plaintiff could have brought a related claim in a prior state court proceeding and failed to do so, he will be barred from bringing that claim in the future.  He would not, however, be barred if the state court lacked subject matter jurisdiction over the claim.  *See Nanavati v. Burdette Tomlin Mem'l Hosp.*, 857 F.2d 96, 112, 115 (3d Cir. 1988).  The District Court determined that the RCRA claim was

47

sufficiently related to the claims brought by the Litgo Appellants in the 1996 proceedings that the entire controversy doctrine applied. It concluded that state courts have concurrent jurisdiction over RCRA claims, so the claim could have been brought in the prior proceeding.

The Litgo Appellants' RCRA claims against the United States Appellees proceeded to trial. The Court found that the United States Appellees were liable under RCRA because they "contributed to the storage and disposal of hazardous wastes which have been linked to the contamination at the Litgo Property." *Litgo I*, 2010 WL 2400388, at \*32. It expressed doubt, however, as to whether injunctive relief was appropriate. It explained that the United States Appellees were not "currently taking any actions at the site that pose an imminent and substantial endangerment to health or the environment and thus there is no need to 'restrain' [them]." *Id.* at \*40. The Court decided not to enter an injunction at that time because it did "not feel that the issue of what injunctive relief would be appropriate has been sufficiently addressed by the parties." *Id.* It explained that the issue of what, if any, injunctive relief should be granted could be addressed at the damages hearing.

Before the hearing on damages, the United States Appellees and the Litgo Appellants entered into a settlement agreement. The Litgo Appellants dismissed their claim for injunctive relief under RCRA, but claimed to have "reserve[d] their right to seek litigation costs from the United States [Appellees] as a 'prevailing party' under Section 7002(e) of RCRA." Supp. App. 8. The Litgo Appellants then moved for costs, which were denied.

The Litgo Appellants now challenge the District Court's dismissal of their RCRA claim against the Sanzari Appellees and its denial of litigation costs. For the reasons that follow, we will reverse the District Court's summary judgment in favor of the Sanzari Appellees and remand for further proceedings. We will affirm the District Court's denial of costs and attorney's fees.

## A. Jurisdiction Over RCRA Claims

The District Court granted summary judgment in favor of the Sanzari Appellees on the RCRA claim because it determined that state and federal courts have concurrent jurisdiction over RCRA claims, such that the claim was foreclosed by the entire controversy doctrine. Because we hold that federal courts have exclusive jurisdiction over claims brought under RCRA, we will remand this claim for further proceedings.

RCRA provides, in relevant part:

Any action under paragraph (a)(1) of this subsection [permitting actions against alleged polluters] *shall be brought* in the *district court* for the district in which the alleged violation occurred or the alleged endangerment may occur. Any action brought under paragraph (a)(2) of this subsection [permitting actions against the administrator of the Environmental Protection Agency (EPA)] may be brought in the district court for the district in which the alleged violation occurred or in the District Court of the District of Columbia. The district court *shall have jurisdiction*, without regard to

the amount in controversy or the citizenship of the parties, . . . to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste.

42 U.S.C. § 6972(a) (emphases added). The overwhelming majority of courts that have addressed this issue have read this provision to confer exclusive jurisdiction on federal courts, based on the statute's instruction that RCRA claims "*shall* be brought" in a "district court." *See Blue Legs v. U.S. Bureau of Indian Affairs*, 867 F.2d 1094, 1098 (8th Cir. 1989); *Interfaith Cmty. Org. Inc. v. PPG Indus., Inc.*, 702 F. Supp. 2d 295, 304 (D.N.J. 2010); *Remington v. Mathson*, 2010 WL 1233803, at \*6–9 (N.D. Cal. Mar. 26, 2010); *K-7 Enterprises, L.P. v. Jester*, 562 F. Supp. 2d 819, 827 (E.D. Tex. 2007); *Spillane v. Commonwealth Edison Co.*, 291 F. Supp. 2d 728, 732 (N.D. Ill. 2003); *White & Brewer Trucking, Inc. v. Donley*, 952 F. Supp. 1306, 1312 (C.D. Ill. 1997); *Prisco v. New York*, 1992 WL 88165, at \*3 (S.D.N.Y. Apr. 22, 1992); *Middlesex Cnty. Bd. of Chosen Freeholders v. N.J., Dept. of Envtl. Prot.*, 645 F. Supp. 715, 719 (D.N.J. 1986).[13] The Sixth Circuit, in contrast, has found that RCRA

---

[13] We have previously noted that the view that federal courts have exclusive jurisdiction over RCRA claims "accords with that of most other courts to have considered the question." *See Raritan Baykeeper v. NL Indus., Inc.*, 660 F.3d 686, 693 (3d Cir. 2011). We did not thoroughly analyze this issue in *Raritan Baykeeper*, however, because both parties conceded that state courts did not have concurrent jurisdiction. *Id*.

does not confer exclusive jurisdiction on federal courts, *Davis v. Sun Oil Co.*, 148 F.3d 606, 612 (6th Cir. 1998), and the District Court followed that path.

Under our federal system, there is a "deeply rooted presumption in favor of concurrent state court jurisdiction." *Tafflin v. Levitt*, 493 U.S. 455, 459 (1990); *see also Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 823 (1990). This presumption "is, of course, rebutted if Congress affirmatively ousts the state courts of jurisdiction over a particular federal claim." *Tafflin*, 493 U.S. at 459. Congress may divest state courts of jurisdiction "either explicitly or implicitly," although its intent to do so must be clear. *Id.* (quoting *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 478 (1981). Thus, exclusive jurisdiction may be conferred "by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests." *Id.* at 459–60 (quoting *Gulf Offshore*, 453 U.S. at 478)).

We agree with the majority of courts that have addressed this issue that the language of § 6972(a) unambiguously demonstrates that federal courts have exclusive jurisdiction over RCRA claims. The statute provides that RCRA claims "shall be brought" in a "district court." As used in this context, "shall be brought" is most naturally read as a mandate; the suit *must* be brought in a district court. *See Middlesex Cnty. Bd. of Chosen Freeholders*, 645 F. Supp. at 719 (citing *United States v. Kravitz*, 738 F.2d 102, 104 (3d Cir. 1984)). When written in the United States Code, "district court" refers to federal, not state, trial courts. Indeed, other statutes instructing parties to file suit in a "district court" involve exclusively federal

51

claims.[14] A provision stating that plaintiffs *must* file in federal court is sufficient to establish that federal courts have exclusive federal jurisdiction. *See Tafflin*, 493 U.S. at 471 (Scalia, J., concurring) ("In the standard fields of exclusive federal jurisdiction, the governing statutes specifically recite

---

[14] *See, e.g.*, 42 U.S.C. § 6972(a) (CERCLA) (action "shall be brought in the district court for the district in which the alleged violation occurred or the alleged endangerment may occur") and 42 U.S.C. § 9613(b) (federal courts have exclusive jurisdiction over CERCLA actions); 28 U.S.C. § 1402(d) ("Any civil action under section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States shall be brought in the district court of the district where the property is located or, if located in different districts, in any of such districts."); 28 U.S.C. § 1403 (eminent domain) ("Proceedings to condemn real estate for the use of the United States or its departments or agencies shall be brought in the district court of the district where the land is located or, if located in different districts in the same State, in any of such districts."); 39 U.S.C. § 3012(b)(1) (civil action brought by the post office) ("Any such action shall be brought in the district court of the United States for the district in which the defendant resides or receives mail.") and 28 U.S.C. § 1355(a) (granting federal courts exclusive jurisdiction over fines and penalties incurred under federal statute). When concurrent jurisdiction exists, litigants are not similarly limited to district courts. *See, e.g.*, 42 U.S.C. § 2000e-5(f)(3) (Title VII) ("Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed . . . .").

*that suit may be brought 'only' in federal court*; that the jurisdiction of federal courts shall be 'exclusive,' or indeed even that the jurisdiction of the federal courts shall be 'exclusive of the courts of the States'" (emphasis added) (internal citations omitted) (citing the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b)(5), as an example of a statute that divested state courts of jurisdiction by directing plaintiffs to file suit in a United States district court)); *cf. id.* at 460–61 (explaining that a provision stating that a person "*may* sue . . . in any appropriate United States district court" did not suggest that federal courts had exclusive jurisdiction, because "[i]t provides that suits of the kind described 'may' be brought in the federal district courts, *not that they must be*" (emphasis added)).[15]

The Sanzari Appellees, relying on the Sixth Circuit's decision in *Davis*, argue that the Supreme Court has previously determined that language similar to the language in RCRA does not deprive the state courts of jurisdiction. In *Yellow Freight*, the Supreme Court addressed whether state courts have concurrent jurisdiction over claims arising under Title VII, which provides:

---

[15] Although Congress could have explicitly used the phrase "exclusive jurisdiction"—and often does so—we reject our dissenting colleague's suggestion that statutes must invoke a "talismanic term" to divest state courts of jurisdiction. Dissenting Op. at 7. Such a requirement contravenes the Supreme Court's repeated instruction that Congress may explicitly or implicitly divest state courts of jurisdiction. *See Tafflin*, 493 U.S. at 459 (quoting *Gulf Offshore*, 453 U.S. at 478).

> Each United States district court and each United States court of a place subject to the jurisdiction of the United States *shall have jurisdiction* of actions brought under this subchapter.

42 U.S.C. § 2000e-5(f)(3) (emphasis added). The Supreme Court held that this language did not "expressly confine[] jurisdiction to the federal courts or oust[] state courts of their presumptive jurisdiction." *Yellow Freight*, 494 U.S. at 823. The Sanzari Appellees argue that the same reasoning applies to the text of RCRA, and the Sixth Circuit expressed the same view in *Davis*, opining:

> The "shall have" language [in Title VII] was not deemed to be sufficient evidence that Congress intended to divest the state courts of jurisdiction over those matters. In the same way, the "shall" language in the RCRA enforcement provision does not grant exclusive jurisdiction to the federal courts in suits brought pursuant thereto.

*Davis*, 148 F.3d at 612.

The similarities between the language at issue in Title VII ("shall have jurisdiction") and RCRA ("shall be brought in the district court") are, at best, superficial. The former is merely a grant of authority; nothing in the statement "Each United States district court . . . shall have jurisdiction" is inconsistent with concurrent jurisdiction. *See Gulf Offshore Co.*, 453 U.S. at 479 ("It is black letter law . . . that the mere grant of jurisdiction to a federal court does not operate to oust a state court from concurrent jurisdiction over the cause of

54

action."). The latter is, by contrast, an order requiring litigants to bring RCRA claims in a district court.[16]

The Sanzari Appellees argue, and our dissenting colleague agrees, that this phrase could be read to mean that "*if* a citizen suit claim is brought in federal court, then it must

---

[16] The Sixth Circuit's decision in *Davis* has been criticized in several academic journals. *See* Jason M. Levy, Note, *Conflicting Enforcement Mechanisms Under RCRA: The Abstention Battleground Between State Agencies and Citizen Suits*, 39 Ecology L.Q. 373, 398 (2012) (describing *Davis* as a "curious decision" that "defies logic"); A. Mark Segreti, Jr., *RCRA Citizen Suits and State Courts: Jurisdictional Trap After* Davis v. Sun Oil Company, 19 Pace Envtl. L. Rev. 73, 92−93 (2001) ("The court did not consider the total phrase 'shall be brought in the district court for the district,' apparently not seeing the significance of a mandatory designation of a court, as opposed to merely conferring jurisdiction on the court by stating that the courts 'shall have' jurisdiction."); Charlotte Gibson, Note, *Citizen Suits Under the Resource Conservation and Recovery Act: Plotting Abstention on a Map of Federalism*, 98 Mich. L. Rev. 269, 282 (1999) (remarking that "Title VII's jurisdictional provision is easily distinguishable from RCRA's"). Even the commentator cited by the dissent, who approved of the result in *Davis*, has described the Sixth Circuit's reasoning as "doubtful," given the differences between the provision in Title VII and the language used in RCRA. Christopher S. Elmendorf, Note, *State Courts, Citizen Suits, and the Enforcement of Federal Environmental Law by Non-Article III Plaintiffs*, 110 Yale L.J. 1003, 1017 (2001).

be brought in the district where the violation or alleged endangerment occurred, rather than the district where a defendant may be subject to personal jurisdiction," Sanzari Br. 65 (citing *Davis v. Sun Oil Co.*, 953 F. Supp. 890, 895 (S.D. Ohio 1996)); Dissenting Op. at 10−11 (quoting Christopher S. Elmendorf, Note, *State Courts, Citizen Suits, and the Enforcement of Federal Environmental Law by Non-Article III Plaintiffs*, 110 Yale L.J. 1003, 1007 (2001)). The problem with this interpretation, however, is that the statutory language is plainly unconditional. The statute does not instruct claimants on what to do "if" they file in federal court. Instead, it mandates: "*Any action* under paragraph (a)(1) of this subsection *shall be brought in the district court* for the district in which the alleged violation occurred or the alleged endangerment may occur." 42 U.S.C. § 6972(a) (emphasis added); *see also* Elmendorf, *supra* at 1017 ("[T]he RCRA citizen-suit provision, if read literally, affirmatively requires citizens to bring their claim in one particular and presumably federal court (the district court for the judicial district in which the alleged violation occurred).").[17]

---

[17] The law review note on which the dissent relies argues that the RCRA provision is ambiguous because it uses the phrase "district court" instead of the phrase "United States district court." This ambiguity, the note contends, permits courts to read the provision as conditional. It suggests that a statute with a similar provision—the Toxic Substances Control Act (TSCA)—likely could *not* be read as conditional because it uses the phrase "United States district court" instead.

In stating that citizen suits "shall be brought in the United States district court for the district in which the alleged violation occurred," TSCA resolves the ambiguity in RCRA and comes as close as a statute can to reserving jurisdiction expressly to the federal courts without use of the phrase "exclusive jurisdiction." To find that TSCA confers state court jurisdiction, *one would have to abandon plain meanings altogether, massaging the word "shall" until it acquires the shape of "may."*

Elmendorf, *supra* at 1019. Because "district court," in fact, unambiguously refers to federal courts, we do not find this distinction to be persuasive. We "would have to abandon plain meanings altogether" to find that parties may bring a RCRA claim in state court.

The dissent further suggests that our interpretation of the statute could have strange results, as "RCRA does not consistently use the term 'shall' while dictating the procedures for filing a citizen complaint." Dissenting Op. at 11. It claims that our interpretation may implicitly permit suits against the EPA or other agencies in state court, even though plaintiffs may only bring suits against polluters in federal district court. Although we need not reach the issue of whether suits brought against the EPA can be brought in state court in this case, we note that we do not think that this result necessarily follows from the text of the statute. As explained above, RCRA provides:

Any action under paragraph (a)(1) of this subsection [permitting actions against alleged

57

polluters] shall be brought in the district court for the district in which the alleged violation occurred or the alleged endangerment may occur. Any action brought under paragraph (a)(2) of this subsection [permitting actions against the administrator of the EPA] may be brought in the district court for the district in which the alleged violation occurred or in the District Court of the District of Columbia.

42 U.S.C. § 6972(a). Read as a whole, the provision may use "shall" in the first sentence because plaintiffs filing suits against polluters have only one choice—they must file suit in the district court in the district where the violation occurred. The use of "may" in the second sentence could simply suggest that plaintiffs filing against the EPA administrator, in contrast, have two choices—the district court in the district where the violation occurred, or the District Court for the District of Columbia. The two provisions, taken together, do not necessarily suggest that a plaintiff could file suit against an agency in the district court in the district where the violation occurred, in the District Court for the District of Columbia, *or* in a state court. Other statutes that have been interpreted as permissive have been stand-alone provisions; they have not been found in a similar context. *See, e.g.*, 18 U.S.C. § 1964(c) (statute found to be permissive in *Charles Dowd Box, Co. v. Courtney*, 368 U.S. 502 (1962), which states only that suits "may" be brought "in any appropriate United States district court"); 47 U.S.C. § 227(b)(3) (Telephone Consumer Protection Act).

Because the New Jersey state court lacked subject matter jurisdiction over the RCRA claim, the District Court erred in determining that the entire controversy doctrine applied and in granting summary judgment to the Sanzari Appellees on that basis. Thus, we will reverse this aspect of the District Court's order and remand for further proceedings.[18]

## B. Litigation Costs under RCRA

The Litgo Appellants also claim that the District Court erred in denying their request for an award of $4,751,201.88 in litigation costs, including attorney's fees, against the

---

[18] The dissent claims that our approach will "'result in a significant impingement of the States' traditional and primary power over land and water use,' thus disrupting the balance of state and federal regulation over state, county, and local pollution that both Congress and the Supreme Court have recognized and respected." Dissenting Op. at 3–4 (internal citation omitted) (quoting *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 174 (2001)). We disagree. We hold only that the rights provided by RCRA's citizen suit provision must be enforced in federal court. This holding does not prevent New Jersey from enforcing its own environmental statutes and common law. *See* 42 U.S.C. § 6972(f) ("Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or requirement relating to the management of solid waste or hazardous waste, or to seek any other relief (including relief against the Administrator or a State agency).").

United States Appellees. Although RCRA gives courts discretion to award a "prevailing or substantially prevailing party" litigation costs, *see* 42 U.S.C. § 6972(e), the District Court refused to grant such an award here, in part because it determined that the Litgo Appellants were not prevailing or substantially prevailing parties.[19] We will affirm on that basis.

To have "prevailed" or "substantially prevailed" on their claims, the Litgo Appellants must have "secure[d] a material alteration of [their] legal relationship" with the United States Appellees—that is, they must have obtained some kind of judicial relief. *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 486 n.12 (3d Cir. 2011) (internal quotation marks omitted) (prevailing party); *United States v. Craig*, 694 F.3d 509, 512 (3d Cir. 2012) (substantially prevailing party); *see also Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 606 (2001). A party who "has failed to secure a judgment on the merits or a court-ordered consent decree, but has nonetheless achieved the desired result because the lawsuit brought about a voluntary change in the defendant's conduct" is not a prevailing party. *Buckhannon Bd.*, 532 U.S. at 600 ("[W]e have not awarded attorney's fees where the plaintiff has . . . acquired a judicial pronouncement that the defendant has violated the Constitution unaccompanied by '*judicial*

---

[19] The District Court further determined that an award of litigation costs would be inappropriate for equitable reasons. Because we agree with the District Court that the Litgo Appellants were not prevailing or substantially prevailing parties, we need not address this alternative holding.

relief,'" *id*. at 605–06 (internal citations omitted)); *see also Hewitt v. Helms*, 482 U.S. 755, 760 (1987) ("Respect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail.").

The District Court found that the United States Appellees were liable parties under RCRA. It did not, however, grant relief on that claim. Instead, it reserved the question of "what, if any, injunctive relief is appropriate" for the hearing on damages. *Litgo I*, 2010 WL 2400388, at \*40 n.36. The Litgo Appellants and the United States Appellees then entered into a settlement agreement, so the District Court never decided whether injunctive relief was proper. Because the Litgo Appellants never obtained judicial relief on their CERCLA claim, the District Court correctly found that they are not entitled to litigation costs.

## VI. Closure Act Claim

Finally, the Litgo Appellants requested rescission of the Sales Agreement under the New Jersey Closure Act, which requires sellers of land to disclose whether the property has ever been used as a landfill in the contract of sale. N.J. Stat. Ann. § 13:1E-116(a). Contracts that do not disclose that there was a landfill on the property are voidable. *Id*. § 13:1E-116(b). The Litgo Appellants argued at trial that there had been a sanitary landfill on the Litgo Property, and that the Sanzari Appellees failed to disclose that fact. The District Court determined that there was insufficient evidence to find that there had been a sanitary landfill.

We cannot say that the District Court's conclusion was clearly erroneous. Although evidence presented at trial

61

demonstrated that there was a landfill on the properties *adjacent* to the Litgo Property, the evidence was ambiguous as to whether the Property itself had been put to such a use. The District Court listed its reasons for finding that the Litgo Appellants had not shown by a preponderance of the evidence that the Property was used as a landfill, which included: (1) lack of documentary evidence; (2) physical evidence suggesting that the Property had not been used for such a purpose; and (3) physical evidence suggesting that the Property would not have been a good site to use for such a purpose. Because these findings are supported by the record, the District Court did not err in denying the Litgo Appellants' request for rescission.

*　　*　　*

For the reasons discussed herein, we agree with the great majority of the District Court's comprehensive and thoughtful consideration of this complex case, and will affirm its judgment in all respects save two: (1) the Litgo Appellants should have been awarded prejudgment interest; and (2) the District Court erred in dismissing the RCRA claim against the Sanzari Appellees. We will vacate the District Court's order in those respects and will remand for further proceedings consistent with this opinion.

GARTH, *Circuit Judge*, dissenting:

There is only one issue in this appeal of true significance. Indeed, it has presented us with an issue of first impression in this Court: whether the individual states have the authority, i.e., concurrent jurisdiction with the federal courts, to regulate pollution of the lands and property within and comprising the state.

The majority opinion in this case proclaims that only the federal courts have jurisdiction to hear Resource Conservation and Recovery Act (RCRA) cases affecting the *property and lands* of the sovereign states and that the states have no jurisdiction to entertain such cases.[1]

---

[1] The relevant text of the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1985 (RCRA), 42 U.S.C. § 6901 *et seq*., provides:

> Any action under paragraph (a)(1) of this subsection shall be brought in the district court for the district in which the alleged violation occurred or the alleged endangerment may occur. Any action brought under paragraph (a)(2) of this subsection may be brought in the district court for the district in which the alleged violation occurred or in the District Court of the District of Columbia. The district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce the permit, standard, regulation, condition, requirement, prohibition, or order, referred to in paragraph (1)(A), to restrain any person who has contributed or who is contributing to the past or present handling, storage,

1

On this basis, the majority has reversed the District Court's order dismissing Litgo's RCRA claim. The District Court held that Litgo had been obliged to bring that claim in New Jersey's Superior Court, where it had previously brought suit against the Sanzari defendants.[2]

---

treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both, or to order the Administrator to perform the act or duty referred to in paragraph (2), as the case may be, and to apply any appropriate civil penalties under section 6928(a) and (g) of this title.

42 U.S.C. § 6972(a).

[2] The issue of concurrent jurisdiction—i.e. whether the respective states' courts have *authority to regulate and control pollution within their own state*—arises because Litgo, the plaintiff, and the Sanzari defendants previously litigated similar issues in New Jersey state court, and at no time during this previous litigation did Litgo raise a claim under RCRA.

New Jersey has adopted an "Entire Controversy Doctrine" which "embodies the principle that the adjudication of a legal controversy should occur in one litigation in only one court." Cogdell by Cogdell v. Hosp. Ctr. at Orange, 116 N.J. 7, 15 (1989). The Entire Controversy Doctrine has been codified to provide that "[n]on-joinder of claims required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine. . . ." New Jersey Court Rule 4:30A.

The majority opinion reaches its conclusion notwithstanding the fact that there is nothing in the text, intent, history, or purpose of RCRA indicating that Congress affirmatively prohibited the states from hearing and deciding cases brought pursuant to RCRA. The majority in its opinion has accordingly defied enduring Supreme Court precedents that go as far back as 1876. See, e.g., Claflin v. Houseman, 93 U.S. 130 (1876); Tafflin v. Levitt, 493 U.S. 455, 459 (1990). Those precedents hold that state courts have the same jurisdiction over claims involving federal law as federal courts do, unless Congress affirmatively and explicitly states otherwise. Congress has not stated otherwise in enacting RCRA.

By failing to give proper weight to the forceful presumption that state courts may exercise jurisdiction over federal-law claims, the majority opinion also undermines the well established primacy of a state in protecting and regulating its *own* property and ground. Adopting the majority's approach "would result in a significant impingement of the States' traditional and primary power over land and water use," Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers, 531 U.S. 159, 174

As this court has recognized, "[a] federal court hearing a federal cause of action is bound by New Jersey's Entire Controversy Doctrine, an aspect of the substantive law of New Jersey, by virtue of the Full Faith and Credit Act, 28 U.S.C. § 1738 (1994)." Rycoline Products, Inc. v. C & W Unlimited, 109 F.3d 883, 887 (3d Cir. 1997). *There is no dispute that, if New Jersey may exercise concurrent jurisdiction over RCRA claims, Litgo's failure to raise this claim in the previous New Jersey court litigation precludes it from litigating this issue anew in the present case.*

3

(2001), thus disrupting the balance of state and federal regulation over state, county, and local pollution that both Congress and the Supreme Court have recognized and respected.

I am therefore obliged to dissent from the jurisdictional holding of the majority. I would hold that RCRA provides concurrent jurisdiction to both state and federal courts in this area of "quintessential state and local power." Rapanos v. United States, 547 U.S. 715, 738 (2006). I would therefore affirm the order of the District Court in having so held.[3]

## I

*Presumption in favor of concurrent jurisdiction*

I begin by highlighting the core principles that must guide analysis of this issue. The Supreme Court has long abided by the "general rule that the grant of jurisdiction to one court does not, of itself, imply that the jurisdiction is to be exclusive." United States v. Bank of New York & Trust Co., 296 U.S. 463, 479 (1936). As the Supreme Court has further emphasized, there is in our federalism a "deeply rooted presumption in favor of concurrent state court jurisdiction." Tafflin, 493 U.S. 459. This presumption, which

---

[3] I agree with the balance of the majority's opinion and thus would affirm all of the District Court's comprehensive and well reasoned opinion other than its decision on prejudgment interest. The District Court denied CERCLA prejudgment interest to Litgo when it should have granted it because CERCLA § 107(a) mandates that interest be paid. Hence we are obliged to reverse and remand for calculation of prejudgment interest.

4

the majority recognizes but refuses to follow, is subject to rebuttal only "if Congress *affirmatively ousts* the state courts of jurisdiction over a particular federal claim . . . . 'by an *explicit statutory directive*, by *unmistakable implication* from legislative history, or by a *clear incompatibility* between state-court jurisdiction and federal interests.'" Id. at 459-60 (emphasis added) (quoting Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 478 (1981)).

As Justice Stevens explained for a unanimous court in Yellow Freight Sys., Inc. v. Donnelly, 494 U.S. 820 (1990): "Under our 'system of dual sovereignty, we have consistently held that state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States.'" Id. at 823 (quoting Tafflin, 493 U.S. 458). The Court looked at Claflin v. Houseman, 93 U.S. 130 (1876) (involving the Bankruptcy Act of March 2, 1867) and Gulfshore v. Mobil Oil Corp., 453 U.S. 473 (involving the Outer Continental Shelflands Act, 43 U.S.C. § 1333), thus illustrating the traditional, generational, and historical context of concurrent jurisdiction.

The Court went on to say: "to give Federal Courts exclusive jurisdiction over a Federal cause of action, Congress must, in an exercise of its powers under the Supremacy Clause, *affirmatively divest* State Courts of their presumptive concurrent jurisdiction." Yellow Freight, 494 U.S. 823 (emphasis added).

In Yellow Freight, the Court was called upon to apply these principles in the context of Title VII. The plaintiff had complained about discrimination in the action brought in the state court. Her claim was removed to the federal court, and when the Court of Appeals for the Seventh Circuit held that there was exclusive jurisdiction over the Title VII litigation,

5

the Supreme Court granted certiorari. In referring to the text of Title VII, the Court noted that Title VII had been enacted with the provision that:

> "[e]ach United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter." 42 U.S.C. § 2000e-5(f)(3) (1982 ed.).

Yellow Freight, 494 U.S. 823. The Court held that this language, notwithstanding its use of the purportedly mandatory term "shall," contained no language that expressly confined jurisdiction to federal courts. Nor did this "shall" language operate to oust the state courts of their presumptive jurisdiction. In so holding, the Court noted that "omission of any such provision [that expressly confines jurisdiction to federal courts or ousts state courts of their presumptive jurisdiction] is strong, and arguably sufficient, evidence that Congress had no such intent" to confer exclusive jurisdiction on the federal courts. Id.

To reiterate, the Court went on to emphasize that "[t]o give federal courts exclusive jurisdiction over a federal cause of action, Congress must, in an exercise of its powers under the Supremacy Clause, *affirmatively divest* state courts of their presumptively concurrent jurisdiction." Yellow Freight, 494 U.S. 823 (emphasis added). Absent such an affirmative divestment, the Court concluded, even a "persuasive showing that most legislators, judges, and administrators who have been involved in the enactment, amendment, enforcement, and interpretation of Title VII expected that such litigation would be processed exclusively in federal courts" was inadequate to support exclusive jurisdiction, as "such

6

anticipation does not overcome the presumption of concurrent jurisdiction that lies at the core of our federal system." Id. at 826.

## II

### *Concurrent Jurisdiction in RCRA*

In enacting RCRA, Congress acknowledged "the collection and disposal of solid wastes . . . to be primarily the function of State, regional, and local agencies . . . ." 42 U.S.C. § 6901(a)(4). The provision of RCRA directly at issue in this case states that "[a]ny action under paragraph (a)(1) of this subsection shall be brought in the district court for the district in which the alleged violation occurred or the alleged endangerment may occur." 42 U.S.C. § 6972(a). Notably, this language plainly does not include the talismanic term "exclusive jurisdiction," as does, for example, CERCLA, 42 U.S.C. § 9613(b),[4] as well as other statutes conferring exclusive jurisdiction.[5] As these statutes make clear, Congress

---

[4] CERCLA, 42 U.S.C. § 9613(b) ("Except as provided in subsections (a) and (h) of this section, the United States district courts shall have *exclusive original jurisdiction* over all controversies arising under this chapter, without regard to the citizenship of the parties or the amount in controversy. *Venue* shall lie in any district in which the release or damages occurred, or in which the defendant resides, may be found, or has his principal office.") (emphases added).

[5] For example, 15 U.S.C. § 78aa, concerning violations of rules governing securities exchanges, provides: "The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have *exclusive jurisdiction of violations of*

7

is perfectly capable of clearly indicating when it intends to oust states of their presumptive jurisdiction.

Absent a clearer grant of exclusive jurisdiction, the text of the RCRA cannot be properly read to oust states of their presumptive jurisdiction. As the Sixth Circuit held in Davis v. Sun Oil Co., 148 F.3d 606 (6th Cir. 1998), "the term '*shall*' as it is used in [RCRA] does not affirmatively divest the state court's of their presumptive jurisdiction. . . . [T]he '*shall*' language in the RCRA enforcement provision does not grant exclusive jurisdiction to the federal courts . . . ." Id. at 612 (emphases added).

In determining, contra Davis, that RCRA confers exclusive jurisdiction on the federal courts, the majority

---

*this chapter* or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder." (emphasis added.)

Similarly, 16 U.S.C. § 2440, concerning the Antarctic Marine Living Resources Convention, provides: "The district courts of the United States *shall have exclusive jurisdiction* over any case or controversy arising under the provisions of this chapter or of any regulation promulgated under this chapter." (emphasis added.)

Likewise, 28 U.S.C. § 1338(a), pertaining to patents and other intellectual property, states: "The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. *No State court shall have jurisdiction over any claim* for relief arising under any Act of Congress relating to patents, plant variety protection, or copyrights." (emphasis added.)

8

opinion emphasizes that "[t]he overwhelming majority of courts that have addressed this issue have read this provision to confer exclusive jurisdiction on federal courts, based on the statute's instruction that RCRA claims '*shall*' be brought in a 'district court.'" Maj. Op. at 50. This position rests on two fatally flawed foundational arguments: first, that there is weighty and persuasive judicial authority on this subject, and second, that the phrase "shall be brought in . . . district court" represents a textual grant of exclusive jurisdiction.

*"The overwhelming majority of courts"*

Of the eight cases cited by the majority for the proposition that there is consensus on this issue, the majority has mustered *only a single* opinion from a Court of Appeals, Blue Legs v. U.S. Bureau of Indian Affairs, 867 F.2d 1094 (8th Cir. 1989). Blue Legs, an Eighth Circuit Court of Appeals opinion, involves Indian tribes and lands rather than the states and state lands. The opinion limits its discussion to just these two sentences:

> Our examination of the RCRA leads us to conclude that exhaustion of tribal remedies is not required in this case.
>
> The RCRA places exclusive jurisdiction in federal courts for suits brought pursuant to section 6972(a)(1) of the Resource Conservation and Recovery Act.
>
> > Any action under paragraph (a)(1) of this subsection [as this case is] shall be brought in the district court for the district in which the alleged violation occurred.
>
> 42 U.S.C. § 6972(a). *Accord Middlesex County Board of Union Freeholders v. New Jersey,* 645 F.Supp. 715, 719–20 (D.N.J.1986).

9

Blue Legs, 867 F.2d 1098 (8th Cir. 1989).

The overwhelming majority of District Courts cited by the majority opinion as overwhelming authority at best echo Blue Legs' two-sentence decision. Just as Blue Legs provided no careful, thoughtful and meaningful analysis, the District Courts which echo Blue Legs provide none either.

I thus do not regard Blue Legs' discussion of jurisdiction, nor the District Courts' discussions which follow Blue Legs' two-sentence discussion of jurisdiction, to be authoritative—and certainly they are not binding in the area of federal/state jurisdiction.

*Venue: the "may" – "shall" distinction*

The substantive textual argument advanced by the majority is unconvincing because it fails to appreciate that RCRA's requirement that actions "shall be brought in the district court for the district in which the alleged violation occurred" imposes a *venue* restriction that applies only *if* a litigant chooses to file in federal court rather than a *jurisdictional* requirement that a litigant *must* file in federal court. As noted in Christopher S. Elmendorf, *State Courts, Citizen Suits, and the Enforcement of Federal Environmental Law by Non-Article III Plaintiffs*, 110 YALE L.J. 1003, 1017 (2001):

> One could read RCRA's mandate that citizen suits "shall be brought in the district court for the district in which the alleged violation occurred" as operating subsequent to the decision to bring a claim in state or federal court. Once you have chosen a judicial system, then you must bring your claims in the district court for the judicial district in which the alleged violation occurred. (footnote omitted.)

10

Examining the provision of RCRA at issue reveals that it concerns venue rather than jurisdiction. *First*, RCRA, § 6972(a), has an express jurisdictional statement. It provides: "The district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties . . . ." Had Congress intended to confer exclusive jurisdiction, it could very naturally and easily have specified that "the district court shall have *exclusive* jurisdiction," as it has done in other statutes, including CERCLA. (See notes 4 and 5, supra.) Instead, Congress has set out a facially nonrestrictive jurisdictional provision, thus leaving undisturbed the presumption of concurrent state court jurisdiction.

*Second*, RCRA does not consistently use the term "shall" when dictating the procedures for filing a citizen complaint. The text immediately following the language at issue, which relates to suits brought against the administrator of the Environmental Protection Agency for failing to perform a non-discretionary action, provides: "Any action brought under paragraph (a)(2) of this subsection *may* be brought in the district court for the district in which the alleged violation occurred or in the District Court of the District of Columbia." § 6972(a) (emphasis added).

As the Supreme Court has recently made clear, permissive formulations of this sort *cannot overcome the presumption of concurrent jurisdiction*. Mims v. Arrow Fin. Services, LLC, 132 S. Ct. 740, 749 (2012) ("Nothing in the permissive language of [the Telephone Consumer Protection Act, 47 U.S.C.] § 227(b)(3) [providing that "A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State"] makes state-court jurisdiction exclusive, or otherwise purports

11

to oust federal courts of their 28 U.S.C. § 1331 jurisdiction over federal claims.").

It cannot be that Congress intended the terms "shall" and "may" as variously used in RCRA, § 6972(a), to implicitly permit suits against the EPA in state court while still insisting on exclusive federal jurisdiction over suits against private polluters. Rather, the "may/shall" distinction obviously refers to the lesser *venue* requirements applicable to suits against the EPA as opposed to than the more restrictive requirement that suits against individual polluters be brought where the pollution occurred.

*Third*, where Congress has elsewhere used the formulation "shall be brought in the district court for the district in which the alleged violation occurred," it has done so in provisions *expressly* concerned with venue.[6]

---

[6] CERCLA, 42 U.S.C. § 9659(b), for example, contains a provision concerning citizen suits that provides:

> Venue
> (1) Actions under subsection (a)(1)
> Any action under subsection (a)(1) of this section shall be brought in the district court for the district in which the alleged violation occurred.
> (2) Actions under subsection (a)(2)
> Any action brought under subsection (a)(2) of this section may be brought in the United States District Court for the District of Columbia.

Similarly, 42 U.S.C. § 11046(b) provides:

> Venue

The majority has thus erroneously decided that Congress has used a statutory formulation for *venue* to override and trump the Supreme Court's instruction and precedent that both state and federal jurisdiction are available under RCRA. Congress in § 6972(a) of RCRA, however, has simply dictated which federal district courts have venue over RCRA claims and has said nothing impinging upon, affecting, or eliminating concurrent state jurisdiction.

## IV

### *Pollution regulation – primary state function*

There is, moreover, no incompatibility between RCRA and state jurisdiction. Quite to the contrary! When one considers the very subject of RCRA, it is all too evident that the individual states, each of which is defined by property borders, have the primary interest and concern in protecting and shielding their own sovereign lands. RCRA recognizes that "the collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies . . . ." 42 U.S.C. § 6901(a)(4). The important state interest in land, moreover, cannot rest at the mercy of federal whim or be restricted just to the federal courts for remediation. As the Supreme Court has said, in describing the limits of federal jurisdiction:

---

(1) Any action under subsection (a) of this section against an owner or operator of a facility shall be brought in the district court for the district in which the alleged violation occurred.
(2) Any action under subsection (a) of this section against the Administrator may be brought in the United States District Court for the District of Columbia.

13

Permitting [the U.S. Army Corps of Engineers] to claim federal jurisdiction over ponds and mudflats falling within the "Migratory Bird Rule" would result in a significant impingement of the States' *traditional and primary power over land and water use.* See, *e.g., Hess v. Port Authority Trans–Hudson Corporation,* 513 U.S. 30, 44, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994) ("[R]egulation of land use [is] a function traditionally performed by local governments"). Rather than expressing a desire to readjust the federal-state balance in this manner, Congress chose to "recognize, preserve, and protect the primary responsibilities and rights of States ... to plan the development and use ... of land and water resources ...." 33 U.S.C. § 1251(b).

Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers, 531 U.S. 174 (emphasis added).

For the same reasons that federal authority cannot excessively intrude on local regulation of land and water, it is essential (absent an express Congressional declaration otherwise) that the states should, through their own courts, be able to enforce the laws governing pollution of their land, even when the source of the law is federal.

V

*Conclusion*

I am compelled to part company with my colleagues in the majority because they have failed to adhere to Supreme Court precedent interpreting Congress' legislation. As I have pointed out, since at least 1867 the Supreme Court has required federal courts to recognize dual jurisdiction in matters such as RCRA. The majority here has not.

14

Instead of respecting our "system of dual sovereignty," which requires that state courts have inherent authority and are thus presumptively competent to adjudicate claims under the laws of the United States, the majority has ignored this principle and thus defied Supreme Court precedent. See Tafflin, 493 U.S. 458 ("Under this system of dual sovereignty, we have consistently held that state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States."). Instead, the majority opinion, as I have pointed out, has followed the unanalytic path of the solitary Court of Appeals which has held that federal courts have exclusive RCRA jurisdiction. Only the District Courts have adopted this position, following the Eighth Circuit opinion of Blue Legs without any additional persuasive analysis.

The opinions of the District Courts do not follow Supreme Court precedent or employ logic in denying RCRA state court jurisdiction. Rather, they have cited to the Blue Legs position and to one another in superficial treatment of their respective jurisdictional conclusions. Sadly and unfortunately, the majority opinion has followed suit. Accordingly, just as with the opinions it has cited, the majority opinion lacks authoritative precedential analysis and statutory interpretation. The majority opinion, and the courts it has looked to, have thus failed to take into consideration the traditional, generational, and historical principles and precedents of concurrent jurisdiction.

It is for that reason that I must dissent. I cannot join the majority opinion, which has remanded this case to the District Court again—a case which originated in actions taken in the 1940s. Respectfully, therefore, I would adhere to Supreme Court teaching and precedent and hold for the first

time in this Court that New Jersey has concurrent jurisdiction in RCRA cases with the federal courts.

In so doing, I would affirm all of the District Court's present judgment in all particulars, with the exception of CERCLA prejudgment interest. <u>See</u> note 3, supra.